IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **EMILY HALL BLODGETT,**<br><br>  Plaintiff,<br><br>  vs.<br><br>**UNITED STATES OF AMERICA,**<br><br>  Defendant. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**<br><br>Case No. 2:06-CV-00565DAK<br><br>**Judge Dale A. Kimball** |

This matter came before the court for bench trial on May 12, 2008. At trial, Daniel F. Bertch represented Plaintiff Emily Hall Blodgett and Amy J. Oliver and Jeffrey E. Nelson represented Defendant United States of America. The court, having heard witness testimony, reviewed the evidence, considered the arguments of counsel, and being fully advised now enters the following Findings of Fact, Conclusions of Law, and Order.

### FINDINGS OF FACT

**Background**

1.  Plaintiff is a twenty-four-year-old female. At the time of collision, discussed herein, Plaintiff was nineteen years old.

2.  Plaintiff grew up in Utah. She graduated from Jordan High School in 2001 and completed two years of college at Utah Valley State College (UVSC), studying sports

1

medicine. Plaintiff did not complete her studies at UVSC.

3. Prior to the collision, Plaintiff suffered no serious health problems. She did not suffer from headaches, neck pain, sciatica, or low back pain. Nor had Plaintiff, prior to the collision, had any injuries related to headaches, neck pain, sciatica, or low back pain.

**Collision**

4. On October 23, 2002, Plaintiff was driving a 1991 Ford Aerostar van southbound on Redwood Road in South Jordan, Utah.

5. United States Postal Service (USPS) employee Michael Dior, was driving behind Plaintiff going the same direction.

6. At about 9620 South, Plaintiff came to a stop when the car in front of her stopped to allow another car to enter the roadway.

7. Dior also attempted to stop but instead struck Plaintiff's van from behind.

8. Plaintiff's van was totaled as a result of the accident. Plaintiff's insurance company paid her $4,112.00 for the value of the van. Defendant has agreed to pay Plaintiff for the property damage.

9. Immediately after the collision, Plaintiff felt dazed.

10. Plaintiff suffered injuries as a result of the accident.

11. Emergency medical technicians were called to the scene of the accident. Plaintiff declined emergency transport for fear it would be too expensive and instead drove with her mother to the Alta View Hospital Emergency Room.

**Emergency Room**

12. Soon after arriving at the hospital, Plaintiff began feeling pain throughout her back. She

also had a headache.

13. At the emergency room, Plaintiff was examined by a doctor and an x-ray of her cervical spine was taken.

14. Emergency department records for Plaintiff state "Neck pain immediate + H[ead] A[che]." These records also indicate that Plaintiff suffered from neck and back pain.

15. The ER doctor diagnosed Plaintiff as suffering from cervical strain.

16. The doctor prescribed various pain medications, including Percocet, Lortab, Flexoril, and Ibuprofin. The doctor ordered Plaintiff to wear a soft collar around her neck.

**Post-Collision**

17. Following the collision, Plaintiff suffered from neck tension and headaches. She also had trouble standing up.

18. From October 25, 2002, to September 14, 2005, Plaintiff sought care from Campbell Chiropractic, where she received gentle treatment to her neck and back, including massage.

19. Medical records from Campbell Chiropractic show Plaintiff complained of neck pain, low- and mid-back pain, and headaches.

20. On November 27, 2002, Open Imaging performed an MRI of Plaintiff's cervical spine. On November 27, 2002, Dr. Ben Fulton interpreted the MRI results and found they were normal.

21. For the time period between September 2, 2003, and June 6, 2004, Plaintiff did not seek medical care with complaints of neck pain, back pain, or headaches.

22. On December 17, 2003, Plaintiff saw Karen Olson-Fields, a nurse practitioner in the

        office of a family practice physician, for a general check up and shots because Plaintiff was leaving in January 2004 to teach English in the Ukraine. During this check up, Plaintiff reported no health problems.

23. Sometime in December 2003, Plaintiff, for the first time, began experiencing a shooting, stabbing pain down her left leg.

24. A few weeks later, Plaintiff left the United States to teach English in the Ukraine.

25. During the plane ride from the United States to the Ukraine, the pain in Plaintiff's leg made it difficult for her to sit, and she spent a majority of the plane ride standing and walking the aisle of the airplane.

26. Plaintiff did not seek medical care in the Ukraine for her leg pain because she did not speak Russian and was not comfortable with Russian medical care.

27. Plaintiff suffered from leg pain during her time in the Ukraine.

28. Plaintiff suffered lower back and leg pain during her return flight to the United States. She had difficulty remaining seated during the flight.

29. On June 7, 2004, Plaintiff sought medical treatment from Olson-Fields for the leg pain that radiated from her mid buttock down her leg. Plaintiff described the pain as sharp and achy. Olson-Fields diagnosed her with sciatica and recommended physical therapy. She did not inform Plaintiff that surgery was a possibility.

30. On August 30, 2004, Plaintiff submitted Standard Form 95 to the USPS claiming damages in the amount of $23,500.00 for neck and back injuries.

31. On September 27, 2004, Plaintiff began physical therapy for her sciatica at Hand & Orthopedic Rehabilitation. Medical reports state Plaintiff's date of injury as December

2003 and detail her difficulties standing, sitting, and walking for longer than ten to fifteen minutes. On a scale of one to ten, with ten being "[e]xtremely [i]ntense," Plaintiff rated her pain at an 8.5.

32. On October 5, 2004, Plaintiff underwent an MRI of the lumbar spine at Utah Imaging. The results showed a disc bulge at the L5/S1 that compressed the S1 nerve root.

33. On October 13, 2004, Plaintiff sought treatment from Dr. Stephen Lordon, a pain management specialist, for "constant, unrelenting" pain below her left buttocks and down her leg to her ankle. Plaintiff described the pain as "throbbing, shooting, stabbing, sharp, tender, burning, [and] tingling." She rated her average pain score as an eight. Plaintiff reported being on Lortab and Ibuprofin, with Lortab use only slightly reducing the pain. Plaintiff indicated that because of the pain she had trouble moving, standing, sitting, and getting out of chairs and cars.

34. On October 15, 2004, and November 5, 2004, Plaintiff underwent nerve root injections by Dr. Lordon at the South Towne Surgery Center.

35. In a followup visit, on October 28, 2004, Plaintiff indicated "fifty to sixty percent" pain relief.

36. On November 29, 2004, Plaintiff reported to Dr. Lordon that the pain had returned and that she had started getting headaches more frequently. She reported that the headaches had increased in intensity since the nerve root injections began. Dr. Lordon discussed with Plaintiff the possibility of surgery to alleviate pain.

37. On December 2004, Plaintiff sought treatment from Dr. Kade Huntsman, an orthopedic surgeon. Medical records indicate that Plaintiff had suffered persistent lower back pain

that radiated all the way down to her ankle. Plaintiff rated both her leg and back pain as "8/10." The report details Plaintiff as suffering from disk herniation, a tear, and a bulging disk. Medical reports also detail Plaintiff as suffering from severe headaches. Dr. Huntsman recommended surgery.

38. On December 17, 2004, Dr. Huntsman performed a microdiscectomy surgery. During surgery, Plaintiff received an anesthetic.

39. Following the surgery, Plaintiff continued to suffer from lower back and leg pain.

40. Plaintiff underwent physical therapy after surgery from January 24, 2005, until February 25, 2005.

41. On July 28, 2005, Plaintiff returned to Dr. Huntsman with complaints of left leg pain that was spreading into her right leg.

42. On July 29, 2005, Plaintiff underwent a lumbar MRI that showed epidural fibrosis and small disc protrusions. The MRI showed an overabundance of scarring.

43. Dr. Huntsman determined that further surgery was not the answer because scarring would only reoccur. Dr. Huntsman recommended pain management.

44. On October 23, 2005, Plaintiff sought treatment from the emergency room at St. Mark's Hospital for a severe migraine headache. Hospital doctors performed a CT scan of Plaintiff's head. Plaintiff was discharged from the hospital and prescribed Lortab for pain relief.

45. On November 11, 2005, Plaintiff sought treatment for her migraines from Dr. Diana Banks, a neurologist, at Rocky Mountain Neurological. Dr. Banks diagnosed Plaintiff with mixed headaches - musculoskeletal and tension with a migraine component. Dr.

Banks recommended treatment with medication at the onset of symptoms.

46. On August 6, 2007, Plaintiff consulted chiropractic practitioner Harold Gunn, D.C. for neck and back pain, as well as headaches.

**Impact**

47. Prior to the collision, Plaintiff engaged in numerous athletic and physical activities. Physical activity was a critical part of Plaintiff's everyday life.

48. Prior to the collision, Plaintiff was a runner and threw javelin for the UVSC track team. She also regularly engaged in other physical activities such as hiking, waterskiing, dancing, frisbee, volleyball, and golf.

49. Prior to surgery, Plaintiff was unable to do most daily activities without pain, including sitting, bending, standing, and dressing.

50. Following surgery, Plaintiff felt some relief and is now able to execute certain daily activities, such as bending, with little or no pain. Plaintiff, however, still suffers constant pain in her low back and down the back of her left leg.

51. Plaintiff's current physical activity is largely limited to walking.

52. Plaintiff's injuries have reached a state of maximum improvement and now are permanent.

**Medical Expenses**

53. On October 23, 2002, Plaintiff incurred a bill of $27.00 from Mountain Medical Physicians for an ER physician examination.

54. On October 23, 2002, Plaintiff incurred a bill of $386.88 by Alta View Hospital for her examination at the ER.

55. From October 25, 2002, through September 14, 2005, Plaintiff incurred bills totaling $4,979.82 for chiropractic care received at Campbell Chiropractic.

56. On November 27, 2002, Plaintiff incurred a bill for $950.00 for a MRI of her cervical spine from Open Imaging.

57. On November 27, 2002, Plaintiff incurred a bill of $366.40 for Dr. Fulton's interpretation of the MRI.

58. Plaintiff incurred bills totaling $210.00 resulting from consultations with Olson-Fields on June 7, 2004; October 8, 2004; and February 8, 2005.

59. Between September 27, 2004, and December 1, 2004, Plaintiff incurred bills totaling $472.00 for eleven physical therapy sessions with Hand & Orthopedic Rehabilitation.

60. After her surgery, Plaintiff incurred physical therapy bills totaling $240.00 for seven sessions with Hand & Orthopedic Rehabilitation.

61. On October 5, 2004, Plaintiff incurred a bill for $1,534.00 for a lumbar MRI from Utah Imaging, performed at St. Mark's Hospital.

62. On October 5, 2004, Plaintiff incurred a bill of $256.00 for the reading and interpretation of the lumbar MRI from Utah Imaging.

63. On October 15, 2004, Plaintiff incurred a bill of $691.00 for Dr. Lordon's nerve root injection performed at South Towne Surgery Center.

64. On November 5, 2004, Plaintiff incurred a bill for $691.00 for another nerve root injection performed by Dr. Lordon at South Towne Surgery Center.

65. On December 9, 2004, Plaintiff incurred a bill of $240.00 for her consultation with Dr. Huntsman.

66.  At her December 9, 2004 visit with Dr. Huntsman, Plaintiff incurred a bill of $75.00 for a lumbar X-ray.

67.  On December 13, 2004, Plaintiff incurred a bill of $77.00 for a follow-up consultation with Dr. Huntsman.

68.  On December 17, 2004, Plaintiff incurred a bill of $2,399.80 for Dr. Huntsman's performance of surgery for her lumbar disc herniation.

69.  In concurrence with her surgery, Plaintiff received anesthesia services from Millcreek Anesthesia on December 17, 2004, for which she was billed $864.00.

70.  Dr. Huntsman performed Plaintiff's surgery at St. Mark's Hospital on December 17 and 18, 2004, for which the hospital billed Plaintiff $6,837.64.

71.  On July 29, 2005, Plaintiff incurred a bill of $2,810.00 for Millcreek Imaging's performance of a MRI of her lower back.

72.  On October 23, 2005, Plaintiff incurred a bill of $1,471.14 for care she received at St. Mark's Hospital Emergency Room.

73.  On November 11, 2005, Plaintiff incurred a bill of $300.00 for consultation with Dr. Banks at Rocky Mountain Neurological.

74.  On August 16, 2007, Plaintiff incurred a bill of $300.00 for chiropractic care from Dr. Gunn.

75.  The above described medical expenses incurred by Plaintiff were reasonable and necessary to treat her symptoms and/or injuries resulting from the October 23, 2002 collision.

**CONCLUSIONS OF LAW**

The court has determined that the foregoing factual findings support the following legal conclusions:

1. No expert witness testimony is necessary to determine causation in this case. *See Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 22, 176 P.3d 446 (stating that in Utah the need for expert testimony to establish causation is required in those cases "[w]here the injury involves obscure medical factors which are beyond an ordinary lay person's knowledge, [thus] necessitating speculation in making a finding [of causation]" (first alteration in original) (additional quotations and citation omitted)). This case does not involve complicating medical factors, and the progressive nature of Plaintiff's neck and back injuries and the incipient onset of symptoms are not "beyond the ordinary senses and common experience of a layperson." *Id.* at ¶ 23. *Cf. id.* at ¶ 22 (concluding that lay testimony was insufficient in that case to show causation where the plaintiff had made admissions tying the cause of her fall to other medical factors).

2. The vehicular collision between USPS employee Dior and Plaintiff on October 23, 2002, was the proximate and actual cause of Plaintiff's cervical strain, lumbar strain, sciatica, disc herniation, and migraine headaches.

3. Plaintiff has incurred reasonable and necessary medical expenses totaling $26,187.68, as a result of the above named injuries.

4. The vehicular collision between Dior and Plaintiff on October 23, 2002, has actually and proximately caused Plaintiff physical pain and loss of enjoyment of life, totaling $100,000.00.

5. The parties have stipulated that Defendant will pay $4,112.00 for the property damage to Plaintiff's vehicle as a result of the October 23, 2002 collision.

6. Plaintiff has acted reasonably in mitigating her damages.

7. Defendant is not liable for prejudgment interest under the Federal Tort Claims Act. *See* 28 U.S.C. § 2674; *see also Hatahley v. United States*, 351 U.S. 173, 182 (1956) (stating that damages under FTCA are determined by the law of the state where the tortious act was committed subject to the limitations that the government shall not be liable for punitive damages or *prejudgment interest*).

## CONCLUSION

The court hereby finds in favor of Plaintiff in the amount of $130,299.68.

DATED this 27th day of May, 2008.

BY THE COURT:

*Dale A. Kimball*

DALE A. KIMBALL

United States District Judge